23CA1570 Peo v Davis 06-25-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1570
El Paso County District Court No. 22CR4236
Honorable Diana May, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Carnel Davis,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE GOMEZ
Pawar and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 25, 2026

Philip J. Weiser, Attorney General, Jessica E. Ross, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John Plimpton, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Carnel Davis, appeals the judgment of conviction entered after a jury found him guilty of second degree murder, felony menacing, robbery, and harassment.  He raises several challenges to the trial court's jury instructions on self-defense.  We reject his challenges and affirm the judgment.

## I.     Background

¶ 2     This case arises out of a deadly shooting outside a nightclub in Colorado Springs.  It's highly disputed what exactly happened that night leading up to the shooting.

¶ 3     Davis told police that he met up with the mother of his child, Shanee Wells, at the nightclub, and that he took her phone as a joke.  He also said that later that night, he and Wells were outside the club when Wells started arguing with someone.  According to Davis, he tried to separate the two, but Wells stumbled to the ground when he grabbed her arm.

¶ 4     Other witnesses, however, reported that Davis stole Wells's phone and that the two of them got into an altercation outside the club when she tried to get her phone back from him.  Wells initially told the police that Davis grabbed her by the head and flung her to the ground, but at trial she testified that he threw her phone at her

1

and then she fell to the ground.  Wells's two female friends, who had gone outside with her, testified that Davis knocked her down, put her in a chokehold, pulled out a gun, held it up to her head, and tried to shoot, but the gun jammed.  They said Davis then pointed the gun toward all three women and tried to fire it again.

¶ 5     Around that time, a group of three men — including the victim — confronted Davis.  Davis said he got into a physical altercation with one of the men, and when a gun fell out of that man's pocket, Davis picked it up, pointed it at the men, and told them to "get the fuck out of [his] face."

¶ 6     The victim then briefly went over to a car, potentially to get a gun (given that one was later found in his pocket).  Davis got into the back seat of another car, and the victim went around the front of that car, yelling Davis's name, possibly followed by one or two of the other men.  Davis said the victim was "charging" at the car and was carrying a black object that might have been a gun, so, fearing for his life, he fired multiple shots in the victim's direction.  Upon seeing the victim on the ground, Davis said he dropped the gun and went to check on the victim but then fled when he heard gunshots nearby.  The victim died from a single gunshot wound to the chest.

¶ 7 After the shooting, Davis turned himself in to police and was charged with first degree murder, four counts of felony menacing (for menacing the murder victim, Wells, and Wells's two friends), robbery (for taking Wells's phone), harassment (for harassing Wells), and other offenses. At trial, one of the defense's theories was that Davis acted in self-defense. As an affirmative defense to the murder charge, the court instructed the jury on the use of deadly force in self-defense. And as an affirmative defense to the menacing charge as to the murder victim, the court instructed the jury on the use of nondeadly force in self-defense.[1] Ultimately, the jury found Davis guilty of the lesser included second degree murder, as well as the four menacing counts and the robbery and harassment counts, while acquitting him of the remaining charged offenses.

¶ 8 On appeal, Davis asserts four challenges to the trial court's self-defense instructions. Specifically, he contends that the court erred by (1) denying his request for a nondeadly force instruction as to the murder charge; (2) failing to define "great bodily injury" for the jury; (3) instructing the jury on the provocation exception to

---

[1] Davis didn't assert self-defense as a defense to the other three menacing charges.

3

self-defense; and (4) failing to specifically instruct the jury on self-defense against multiple assailants. We set forth the applicable legal standards and then address each of these contentions in turn.

## II. Legal Standards

¶ 9 A trial court has a duty to correctly instruct the jury on all matters of law for which there is sufficient evidence to support giving instructions. *People v. Knapp*, 2020 COA 107, ¶ 20. However, a court shouldn't instruct the jury "on abstract principles of law unrelated to the issues in controversy, nor . . . on doctrines or principles which are based upon fanciful interpretations of the facts unsupported by the record." *Castillo v. People*, 2018 CO 62, ¶ 34 (quoting *People v. Alexander*, 663 P.2d 1024, 1032 (Colo. 1983)). Thus, a trial court must determine whether there is sufficient evidence to warrant a jury instruction on an affirmative defense and any exceptions to that defense. *Id.*

¶ 10 When the issue is preserved, we review de novo whether there was sufficient evidence to support an instruction. *Id.* at ¶ 32. In doing so, we view the evidence in the light most favorable to giving the instruction. *Knapp*, ¶ 21.

¶ 11    We review unpreserved challenges to the court's jury instructions for plain error. *People v. Van Meter*, 2018 COA 13, ¶ 42. Under this standard, reversal is required only if an error was both obvious and substantial. *Hagos v. People*, 2012 CO 63, ¶ 18. For an error to be obvious, it ordinarily must violate a clear statutory command, a well-settled legal principle, or Colorado case law. *Scott v. People*, 2017 CO 16, ¶ 16. And for an error to be substantial, there must be a reasonable possibility that it contributed to the conviction. *Van Meter*, ¶ 42.

### III.    Nondeadly Force Instruction

¶ 12    Davis first contends that the trial court erred by denying his request to instruct the jury on the use of nondeadly force (in addition to deadly force) in self-defense as to the murder charge. We disagree.

¶ 13    Under section 18-1-704(1), C.R.S. 2025, "a person is justified in using physical force upon another person in order to defend himself . . . from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose." But a person may use "[d]eadly

5

physical force" — defined as "force, the intended, natural, and probable consequence of which is to produce death, and which does, in fact, produce death," § 18-1-901(3)(d), C.R.S. 2025 — only if, as pertinent here, the person "reasonably believes a lesser degree of force is inadequate and . . . has reasonable ground to believe, and does believe, that he . . . is in imminent danger of being killed or of receiving great bodily injury." § 18-1-704(2)(a).

¶ 14    "In order to present an affirmative defense for the jury to consider, a defendant must offer 'some credible evidence' to support the claimed defense." *Pearson v. People*, 2022 CO 4, ¶ 16 (quoting § 18-1-407(1), C.R.S. 2025). The threshold for entitlement to an instruction on an affirmative defense is "low," but "not negligible." *People v. Opana*, 2017 CO 56, ¶ 17.

¶ 15    In *Opana*, the supreme court held that the determination of whether a defendant is entitled to a nondeadly force instruction, as well as a deadly force instruction, depends not on the defendant's subjective intent but, rather, on the nature of the force the defendant used. *Id.* at ¶¶ 13-17. A court can refuse to give a nondeadly force instruction only if "the credible evidence permits no other finding than that the physical force used by the defendant

6

would normally be expected to, and in fact did, produce death." *Id.* at ¶ 16. In *Opana*, where the defendant "shot the victim in the chest, at close range, with a large caliber firearm," the supreme court determined "there was no evidence from which the jury could have found that the defendant's use of physical force upon the victim was anything other than deadly physical force." *Id.* at ¶ 17.

¶ 16　　Here, Davis purposely shot four or five bullets in the direction of the victim, striking the victim in the chest, at relatively close range. And the victim died as a result of a gunshot wound from one of those bullets. Thus, despite Davis's contention that he just fired generally in the victim's direction without any intent to kill or even hit the victim, much like in *Opana*, the evidence permits no other finding than that the physical force Davis used would normally be expected to, and did, produce death. The statistics Davis provides regarding mortality rates for gunshot wounds are inapposite in light of the supreme court's holding in *Opana*. So is Davis's subjective intent when he fired a gun in the victim's direction. Regardless of whether Davis actually intended to kill the victim, the force he used is normally expected to, and in fact did, produce death. Indeed, the defendant in *Opana* claimed that his gun had accidentally

discharged and he hadn't intended to pull the trigger, yet the supreme court concluded that "he was clearly not entitled to a self-defense instruction premised on the use of any physical force other than deadly physical force."  *Id.* at ¶¶ 4, 17.

¶ 17    Accordingly, the trial court didn't err by denying Davis's request for a nondeadly force instruction on the murder charge.

## IV.    Definition of "Great Bodily Injury"

¶ 18    Next, Davis contends that the trial court plainly erred by failing to instruct the jury on the definition of "great bodily injury," as referenced in the deadly force self-defense instruction.  We're not persuaded.

¶ 19    "Great bodily injury," which is not statutorily defined, means the same thing as "serious bodily injury," which is statutorily defined.  *People v. Reed*, 695 P.2d 806, 808 (Colo. App. 1984). A statute defines "[s]erious bodily injury" as "bodily injury that, either at the time of the actual injury or at a later time, involves a substantial risk of death; a substantial risk of serious permanent disfigurement; a substantial risk of protracted loss or impairment of the function of any part or organ of the body; or breaks, fractures, a

penetrating knife or penetrating gunshot wound, or burns of the second or third degree." § 18-1-901(3)(p).

¶ 20    Here, the trial court instructed the jury on the definitions of "bodily injury" and "serious bodily injury" (a phrase used in the instruction on menacing). However, the defense didn't request, and the court didn't provide, a definition of "great bodily injury" (a phrase used only in the deadly force self-defense instruction). Nonetheless, Davis contends that this was error because it could have led the jury to believe that "great bodily injury" was different than "serious bodily injury."

¶ 21    We conclude that any error in failing to define "great bodily injury" wasn't plain. Even if any error was obvious — given the supreme court's holding in *People v. Fichtner* that a trial court erred by failing to define "serious bodily injury" for a jury, 869 P.2d 539, 543 (Colo. 1994) — we conclude that it wasn't substantial.

¶ 22    Davis surmises that the jury may have wrongly assumed that "great bodily injury" required something more than "serious bodily injury." Thus, he argues, the jury may have assumed he had to have reasonably believed he was going to be subjected to a more severe injury than was actually required before employing deadly

force. But nothing in the record suggests the jury would have interpreted the instructions that way, and, as the division in *Reed* explained, "there is no rational basis for distinguishing between 'great' and 'serious' as applied to bodily injury." 695 P.2d at 808.

¶ 23 Nor were the parties' arguments at trial centered on any potential distinction between "great" and "serious" bodily injury. In closing argument, the prosecutor's primary argument on self-defense as to the murder charge was that Davis didn't have any reason to believe the victim was holding a gun; indeed, the prosecutor noted that at one point in his police interview, Davis had said he didn't actually see a gun on the victim. The prosecutor also highlighted evidence that the victim wasn't approaching Davis in an aggressive manner. And she observed that in his police interview, Davis had said he'd shot the gun because "he couldn't take the chance" that the victim "might just come up to [him] and . . . slap [him] with a gun or something or whatever he had in his hand," rather than saying he'd done it because he "feared for his life." Defense counsel, in response, argued that it was reasonable for Davis to view the victim's approach as aggressive and to believe he was coming with a loaded gun.

¶ 24    There was a lot of conflicting evidence at trial as to exactly what happened in the parking lot, and the surveillance video that was admitted was dark and was from a distance and angle that didn't clearly show the shooting or the acts leading up to it.  So the key issue in Davis's assertion of self-defense as to the murder charge was whether Davis reasonably believed the victim was approaching him with an intent to potentially shoot him — and any distinction between "great" and "serious" bodily injury would not have impacted that issue.  *See Fichtner*, 869 P.2d at 544 (the trial court's failure to instruct the jury on the definition of "serious bodily injury" didn't amount to plain error because it wouldn't have made a difference at trial).  Thus, there is no reasonable possibility that the lack of a definition of "great bodily injury" might have contributed to Davis's convictions.  *See Van Meter*, ¶ 42.

V.    Provocation Exception to Self-Defense

¶ 25    Davis also contends that the trial court plainly erred by instructing the jury on the provocation exception to self-defense because there was no evidence to support it.  We disagree.

¶ 26    Under the provocation exception to self-defense, a person is "not justified in using physical force" against another person if,

11

"[w]ith intent to cause bodily injury or death to another person, he provokes the use of unlawful physical force by that other person." § 18-1-704(3)(a).

¶ 27 When a court instructs the jury on an exception to self-defense, that exception must be "supported by some evidence." *Galvan v. People*, 2020 CO 82, ¶ 25. Accordingly, a provocation instruction should be given in a self-defense case only if there is evidence that the victim made an initial attack on the defendant and the defendant's conduct or words were intended to cause the victim to make the attack and provide a pretext for injuring or killing the victim. *Knapp*, ¶ 23; *People v. Silva*, 987 P.2d 909, 914 (Colo. App. 1999).

¶ 28 The deadly force self-defense instruction the trial court gave on the murder charge included language regarding the provocation exception. Defense counsel didn't object to that language.

¶ 29 The following evidence supports the provocation instruction:

- Some witnesses testified that Davis took Wells's phone, knocked her down, put her in a chokehold, pointed a gun at her head, and tried to shoot her before the victim and two other men came to her defense.

12

- One witness reported that the men said Davis shouldn't be treating a woman like that, but none of them put their hands on him.

- Davis admitted that he picked up a gun, pointed it at the group of men, and said, "[G]et the fuck out of my face."

- As soon as Davis pointed the gun, the victim walked away to a car — potentially to retrieve a gun — and then continued to engage with Davis and call out his name.

¶ 30    Although Davis argues that his actions in pointing the gun and saying "get the fuck out of my face" and then getting into a vehicle demonstrate his retreat from the situation, a fact finder could interpret those actions differently and see the pointing of the gun and the statement as provoking a confrontation. Thus, there was some evidence to support a finding of provocation, and the trial court didn't err — much less plainly err — by instructing the jury on it. *See Galvan*, ¶ 25; *see also People v. Roberts-Bicking*, 2021 COA 12, ¶¶ 38-40 (evidence that the defendant pulled out a gun, pointed it at the victim, and said, "If you want to fuck with me, try it" justified a provocation instruction).

## VI. Self-Defense Against Multiple Assailants

¶ 31　Additionally, Davis contends that the trial court plainly erred by failing to specifically instruct the jury on the right to use self-defense against multiple assailants. Again, we disagree.

¶ 32　In *People v. Jones*, the supreme court held that a trial court erred by improperly restricting the defendant's right to assert self-defense in a multiple assailant situation. 675 P.2d 9, 13-14 (Colo. 1984). In that case, the trial court rejected the defense's proposed self-defense instruction, which addressed his right to use force to defend against both the victim and the victim's associates (all of whom allegedly attacked him at once), and instead gave an instruction that omitted any reference to that right. *Id.* The supreme court concluded that the trial court thereby erred because its instruction "vitiated the defendant's right to act upon reasonable appearances in a multiple assailant attack." *Id.* at 14.

¶ 33　Since then, the supreme court has clarified that "*Jones* does not require a trial court to give a specific multiple assailants instruction in *every* case involving both multiple assailants and self-defense." *Riley v. People*, 266 P.3d 1089, 1094 (Colo. 2011). Rather, the court held, "*Jones* stands for the principle that a jury

must consider the totality of the circumstances, including the number of persons reasonably appearing to be threatening the defendant," when determining the reasonableness of the defendant's use of force in self-defense. *Id.* "Thus, so long as the given instructions properly direct the jury to consider the totality of the circumstances during its deliberations on reasonableness, those instructions will satisfy *Jones.*" *Id.*

¶ 34 Here, both self-defense instructions — for the murder charge and for the menacing charge as to the murder victim — directed the jury to assess the "reasonable[ness]" of Davis's actions and to "consider[] all the evidence" in determining whether Davis's use of force was justified. There was no language specifically referring to the right to use force against more than one person. But the defense didn't ask for any such language.

¶ 35 We conclude that any error in not providing a more explicit multiple assailants instruction wasn't plain, as it was neither obvious nor substantial.

¶ 36 First, any error wasn't obvious because the law is unclear as to whether a stock self-defense instruction, as used here, may be sufficient to satisfy *Jones.* *See Scott*, ¶ 16; *see also Roberts-Bicking*,

¶ 25 ("[T]he supreme court in *Riley* appears to have left open the possibility that . . . a stock jury instruction on self-defense alone would be sufficient to satisfy *Jones*.").

¶ 37    And second, any error wasn't substantial because the instruction still required the jury to consider the totality of the circumstances.  Additionally, as to the second degree murder conviction, the primary focus at trial was whether Davis had reason to believe the victim was approaching him with a loaded gun; there was very little reference to any other men potentially being with the victim at that time or to whether those other men may have had guns.  (Indeed, Davis said he grabbed the gun one of those men previously had when it fell out of that man's pocket.)  And as to the menacing conviction regarding the murder victim, the evidence was overwhelming that Davis hadn't initially pointed the gun toward the murder victim and the other two men out of self-defense; rather, the evidence indicated that Davis did so because he was "pissed" that the three men were interfering in his altercation with Wells.  Thus, there is no reasonable possibility that the lack of more explicit multiple assailant language in the self-defense instructions might have contributed to Davis's convictions.  *See Van Meter,* ¶ 42.

16

¶ 38     Lastly, Davis contends that the cumulative effect of the alleged errors requires reversal of his convictions.  We aren't persuaded.

¶ 39     Even when individual errors may be deemed harmless, reversal is required if "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process."  *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (alteration in original) (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)).  Thus, we reverse under the cumulative error doctrine if we've "identif[ied] multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not."  *Id.* at ¶ 25.  But the doctrine of cumulative error requires that multiple errors were committed, not just alleged.  *People v. Sauser*, 2020 COA 174, ¶ 106.

¶ 40     Even if we assume that the trial court erred in its self-defense instructions by not defining "great bodily injury" and not specifically addressing the right to use self-defense against multiple assailants — issues we didn't resolve, as we concluded that any error wasn't plain — those two potential errors collectively didn't deprive Davis of a fair trial.  For all the reasons we've explained,

17

neither alleged error was substantial, largely because neither pertained to the issues that were critical to the jury's assessment of Davis's assertion of self-defense. Even combining any prejudice caused by both alleged errors, the alleged errors didn't substantially affect the fairness of the trial proceedings or the integrity of the fact-finding process. *See Howard-Walker*, ¶ 24.

¶ 41 Accordingly, we reject Davis's cumulative error argument.

## VIII. Disposition

¶ 42 The judgment is affirmed.

JUDGE PAWAR and JUDGE JOHNSON concur.